## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 28 2020, 10:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander W. Robbins
Public Defender - Morgan County
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

A.M. *(Minor Child)*

and

W.M. *(Father)*,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

February 28, 2020

Court of Appeals Case No. 19A-JT-2035

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause No. 55C01-1903-JT-90

**Robb, Judge.**

# Case Summary and Issue

[1] W.M. ("Father") appeals the termination of his parental rights to his child and presents the sole issue of whether the juvenile court's order terminating his parental rights was clearly erroneous. Concluding it was not, we affirm.

# Facts and Procedural History

[2] Father and J.P. ("Mother"), now deceased, are the biological parents of A.M., born June 18, 2007 ("Child"). The Department of Child Services ("DCS") became involved in this case in 2016. At that time, Mother had legal custody of Child and shared another child with her boyfriend, M.G. The four of them lived together. On November 1, 2016, DCS received a report that M.G. and his sister snorted heroin in the bedroom and M.G. overdosed; Mother was in the other room with Child's half-sibling and Child was at school. DCS believed Mother was sober and an appropriate parent, and Mother agreed to enter into an informal adjustment to address M.G.'s substance abuse issues. Father was a "non-offending parent or at least extraneous" to the case and therefore, was not part of the informal adjustment. Transcript at 20.

[3] On December 14, 2016, DCS filed a petition alleging Child was a child in need of services ("CHINS").[1] Around February 2017, Father became involved with

---

[1] Initially, filings named Child as "A.P." but Child's correct name is "A.M." *See* Tr. at 19; *see also* Supplemental Exhibit Index at 3-15, 39-41.

DCS in another matter concerning his wife and his wife's two children. DCS began an informal adjustment due to Father's use of methamphetamine and determined that Father's wife was an appropriate caregiver for her children. Father entered into an informal adjustment and agreed to participate in services to address his substance abuse issues. Father completed a substance abuse evaluation at Centerstone on February 7, which recommended substance abuse treatment. Despite attempts to contact Father, he never participated in any recommended services and was discharged. Eventually, Father and his wife separated and divorced; DCS successfully closed out the informal adjustment with Father's wife.

[4] An initial/detention hearing for Child was held in February 2017, and the juvenile court adjudicated Child a CHINS on March 28, 2017. Following a dispositional hearing on April 4 at which Father failed to appear, the juvenile court ordered Father to (among other things): maintain weekly contact with the DCS family case manager ("FCM"); timely enroll in recommended programs; obtain and maintain suitable housing and income; refrain from drug use; obey the law; submit to random drug screens; and complete a substance abuse assessment and follow all recommended treatment. *See* Supplemental Exhibit Index at 64-67. At the time, Child remained in Mother's care.

[5] The juvenile court held a periodic case review hearing on July 10 and ordered Child to remain in Mother's care. Father failed to appear. On July 13, Father reached out to the DCS FCM and asked what he needed to do to move forward in the CHINS case; the FCM informed Father he needed to participate in the

recommended services but Father stated he did not want to participate in group services. From July 13, 2017 to September 24, 2018, Father ceased all contact with the FCM despite numerous attempts to contact him through his parents, Child, and Mother.

[6] Due to Mother's own substance abuse issues, Child was removed from Mother's care on July 24, 2017 and placed with her maternal grandparents. Later, on October 3, Father completed a new substance abuse evaluation at Centerstone during which he disclosed that he has been using methamphetamine daily for the last three or four years and he used as recently as three days prior to the evaluation. Centerstone referred Father to an intensive outpatient program ("IOP")[2] program – an addictions and parenting group, which focuses on parenting skills and maintaining sobriety. Father attended five sessions but missed eleven. Due to Father's non-compliance with the program and positive drug screens, he was discharged from services.

[7] Following a review hearing on November 2, the juvenile court found that Father: had not complied with Child's case plan; tested positive for methamphetamine; failed to visit Child; and had not cooperated with DCS. *See id.* at 96-97. In February 2018, the juvenile court found that Father "is not participating in this case." *Id.* at 99. A permanency hearing was held on May 3, 2018, and the juvenile court again found that Father was missing and not

---

[2] Although not explicitly defined in the record, we believe "IOP" refers to an intensive outpatient program.

participating in the case. The court subsequently entered an order changing Child's permanency plan from reunification to reunification with a concurrent plan of adoption. Father failed to appear for each of these hearings.

[8]     As of the August 9 review hearing, Father was still missing and non-compliant with the case plan. However, the FCM learned that Father had an active criminal case and successfully made contact with Father on September 24 at the courthouse. At the time, Father stated he would engage in services and "want[ed] to fight for his daughter." Tr. at 25. However, Father never reached out to re-engage in services and again ceased contact with the FCM. The juvenile court held another review hearing on December 12 and again, Father failed to appear and the juvenile court found Father had been non-compliant with the case plan, had not enhanced his ability to fulfill his parental obligations, and had not visited Child. *See* Supp. Ex. Index at 106-07.

[9]     In January 2019, Father was arrested on multiple counts of substance abuse related charges – possession of methamphetamine, possession of paraphernalia, possession of a narcotic drug, unlawful possession of a syringe, and maintaining a common nuisance. On March 1, 2019, DCS filed its petition for the involuntary termination of Father's parental rights. While incarcerated, Father met with the FCM and indicated he was interested in participating in services. However, Father is not able to participate in any DCS-offered services while incarcerated because jail policy no longer allows service providers to work one on one in the jail.

The juvenile court held a termination hearing on May 15, 2019; however, the juvenile court was informed that Mother had recently died. Therefore, the juvenile court removed Mother from the case and the matter remained set for a full termination hearing. The fact-finding hearing was held on August 1, 2019 during which Father testified that he has completed several courses while incarcerated. Following the hearing, the juvenile court entered an order terminating Father's parental rights and found, in pertinent part:

> 147) The main issues facing the [C]hild at the time of removal included drug use and a lack of supervision on the part of the [M]other.

> 148) [A]s time progressed [M]other's issues continued but [F]ather simply refused to be engaged.

> 149) By not engaging in any services whatsoever he simply walked away from his obligations to provide any sort of security or support and leave [sic] the issue of his daughter being raised to others.

> 150) [F]ather was tangentially involved with his wife and his other children with DCS and apparently was failing drug tests and not participating with those issues around the time this case began.

> 151) It is foolish to believe that [F]ather did not understand his requirement to get involved in this case, foolish to believe he did not know how to contact the DCS since he did on several occasions and foolish to believe he ever had the intent to care for this [C]hild.

152)  [A]round the time the [C]hild was taken from the [M]other for drug use, the [F]ather did call one (1) time in July of 2017 and stated a desire to be engaged.

153)  Nothing ever came from that call.

154)  Later in October of 2017 the [F]ather apparently did become engaged for a very short period of time and then once more disappeared.

155)  [A]t no time thereafter for a period of over a year did the [F]ather ever try to contact the DCS, inquire about where his daughter was or how to see her, try to work with anyone to get her back nor showed any indication of presenting himself as a viable option to care for his [C]hild.

156)  [O]nce in jail[, F]ather has suddenly found some direction by passing some drug classes and indicating a desire to continue classes if and when released.

157)  Perhaps [F]ather is also driven by the fact of the recent passing of the [M]other which has left the [C]hild with only one viable parent.

158)  It is not a far stretch to see that [F]ather has, like most in jail and facing significant time, "found Jesus."

159)  [F]ather, only once caught and facing up to thirty (30) years in jail, finally is trying to take some classes, has asked to contact the [C]hild and for the first time since December of 2016 has shown any indication he intends to parent this [C]hild.

160)  In the meantime, this [C]hild has suffered through her [M]other missing visits, cutting herself, cutting off her hair to get

her [M]other's attention and finally her [M]other's death all while [F]ather has done absolutely nothing to help her.

161) The stability issue remains, the drug issues remain, the unwillingness to step up and be a parent remains and unfortunately this [C]hild is in a much worse position today than she was at the time she was taken from her parents the first time.

162) [Child] has been through the trauma of living with others, her [M]other dying and her [F]ather simply ignoring her. These should not have to be the memories of a young lady that desperately has been seeking the attention and love of her parents.

163) The exact same dangers that were present for this [C]hild when the CHINS case began still exist today and are perhaps even more strongly present than ever before.

* * *

169) Father clearly has and has had issues with drugs for many years that are unresolved.

170) [F]ather only is sober now due to a long incarceration.

171) [F]ather jumpstarted his efforts but failed on at least two (2) occasions for a period of no more than a month to try and get involved and these feeble attempts are untenable.

172) Father's complete lack of involvement is simply inexcusable and rises to the level of highest neglect.

173)  [F]ather's feeble attempt to claim he had no notice or that DCS did not contact him appropriately to get him involved falls on deaf ears since [he] did contact them at least two (2) times, was served with personal notice when the case started and even worked with DCS in another case prior to this case being filed.

174)  [T]his court is aware that criminal charges do not equal convictions in criminal cases, there are strong indications that [F]ather still has a substantial drug issue and/or that he will be in some sort of penal facility/institution for some time whether to fight these charges or if they are found true.

175)  There was no indication or testimony that [F]ather even has the ability to care for this [C]hild even if he is released.

176)  This is indicated by the fact he never showed up for any hearings, never got involved in this case, has been living in apartments or barns during this case, has never indicated having a job and simply presented no indication he has any plans to do these things.

Appealed Order 10-13.  Based on these findings, the juvenile court concluded there is a reasonable probability that the conditions that led to Child's removal and continued placement outside of Father's care will not be remedied.  The juvenile court also concluded that the continuation of the parent-child relationship poses a threat to Child's well-being and termination of Father's parental rights is in Child's best interests.  Father now appeals.

# Discussion and Decision

# I. Standard of Review

We begin, as we often do, by emphasizing that the right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* Although parental rights are of a constitutional dimension, they are not without limitation and the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). We acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," but also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we

consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[13] As required by Indiana Code section 31-35-2-8(c), the juvenile court entered findings of fact and conclusions thereon. Therefore, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Bester*, 839 N.E.2d at 147. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Termination of Father's Parental Rights

[14] Before an involuntary termination of parental rights may occur in Indiana, DCS must allege and prove, in relevant part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements in that subsection has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[15] We begin by noting that Father does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Father challenges the juvenile court's conclusion that a reasonable probability exists that the conditions that led to

Child's removal and continued placement outside of his care will not be remedied. Specifically, Father argues this conclusion is erroneous because he has demonstrated a "lengthy commitment . . . to better himself in an effort to assume care for his daughter" by participating in several courses while incarcerated. Appellant's Brief at 9. We disagree.

[16] We engage in a two-step analysis to determine whether conditions will be remedied: "First, we must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable

probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[17] Here, Child was removed from Mother's care due to her substance abuse issues; however, Child remained outside of Father's care due to his substance abuse issues and failure to participate in services. We conclude there is ample evidence in the record to support the juvenile court's conclusion that there is a reasonable probability that the conditions for Child's continued placement, namely Father's substance abuse and related issues, will not be remedied.

[18] As demonstrated through the record, Father has failed to participate in this case by not complying with services to address his substance abuse issues, not attending court hearings, and not attending visitation with Child. Initially, as part of an informal adjustment, Father completed a substance abuse evaluation at Centerstone on February 7, 2017. Melissa Oran, DCS liaison at Centerstone, testified that treatment was recommended based on the evaluation; however, despite numerous attempts to contact Father, he never participated in any treatment. *See* Tr. at 14.

[19] FCM Wendy Tolliver[3] has been involved in Father's case since its inception in November 2016. In July 2017, Father reached out to Tolliver and asked what he needed to do to move forward in the case. Tolliver stated that he needed to participate in services and "laid out everything that was recommended for

---

[3] The record establishes that Ms. Tolliver previously went by Wendy Pickett.

him." *Id.* at 24. However, Father stated he would not participate in groups "because he did not want people in town knowing his business." *Id.* at 22. Father subsequently ceased all contact with Tolliver until September 2018 – over fourteen months later. During this time, Tolliver attempted to contact Father through his parents, Child, and Mother, but was unsuccessful. It was not until Tolliver discovered that Father had an active criminal case that she was able to make contact with Father on September 24, 2018 by going to the courthouse. At that time, Father again indicated he would engage in services and "want[ed] to fight for his daughter." *Id.* at 25. After this interaction, Father did not reach out to Tolliver, never engaged in services, and again ceased all contact with her.

[20] In October 2017, Father again completed a substance abuse assessment at Centerstone with Ashley Risk, a crisis access therapist. During the evaluation, Father indicated he has been using methamphetamine daily for the last three to four years and had used three days prior to the evaluation. Based on Father's history, Risk acknowledged an IOP was "definitely warranted" and Father needed to complete the recommended treatment. *Id.* at 11. Risk referred Father to an IOP; he participated in five substance use and parenting group sessions but missed eleven. Ultimately, Father did not complete the program and was discharged from the group in November 2017 due to his "[n]oncompliance with attendance and then there were positive [drug] screens." *Id.* at 15. At the fact-finding hearing, Oran testified that Father did not make any progress with respect to obtaining and maintaining sobriety and

consequently, toward reunification with Child. Tolliver also testified that Father did not make any kind of progress with respect to completing services and addressing his original issues. She further stated that substance abuse continues to be an issue for Father and there is "no proof that [Father] has remedied his substance abuse issues. He's currently in jail on charges related to substance abuse. [A]nd has throughout the life of this case continued to receive charges related to substance abuse." *Id.* at 30.

[21] Father's criminal history also supports the juvenile court's conclusion there is a reasonable probability Father will not remedy his substance abuse problems. Since this case began in November 2016, Father has been charged with multiple criminal charges related to his unresolved substance abuse issues, including multiple counts of possession of methamphetamine, possession of paraphernalia, possession of a narcotic drug, unlawful possession of a syringe, and maintaining a common nuisance. Father was arrested in January 2019 and has remained incarcerated since.

[22] Around that time, Father's case was transferred to FCM Alexa Smith. In March 2019, Smith met with Father and he stated he was interested in participating in services. Smith then submitted referrals to Ireland Homebased Services for fatherhood engagement and individual therapy; however, the referrals were rejected because jail policy no longer allows service providers to work one on one in the jail. Therefore, Father is not able to participate in any DCS-offered services while incarcerated. At the fact-finding hearing, Smith testified that in her discussions with Father, he indicated he was potentially

facing up to thirty years in prison. More recently, Father told Smith he was trying to get a plea agreement that would allow him to join the Indiana Dream Team, which is a three-year program. Smith testified that Father's "criminal charges indicate . . . ongoing substance abuse issues. [And] from the time he wasn't incarcerated . . . I would have concerns for him to be able to maintain his sobriety outside of the incarceration." *Id.* at 45. Ultimately, Smith opined that the issues prompting DCS involvement have not been resolved.

[23] Furthermore, Father failed to attend court hearings and failed to consistently visit Child. Tolliver testified that from February to July 2017, Father attended supervised visitation but "[f]rom that point forward because he was completely non-compliant in services and not participating in this case, he was not attending court[,] we were no[t] offering him visitation any longer." *Id.* at 27.

[24] Father contends he has made progress by completing several substance abuse and religious courses available to him while incarcerated, including Mothers Against Methamphetamine and Reformers Institutional Program classes. *See* Exhibit Index at 5-20. Given Father's completion of these courses, he argues his case is similar to *K.E. v. Ind. Dep't of Child Servs.,* 39 N.E.3d 641 (Ind. 2015), in which our supreme court reversed the termination of an incarcerated father's parental rights where he made "substantial efforts towards bettering his life" by participating in numerous programs available to him during his incarceration. *Id.* at 648. In *K.E.*, the father's release was pending, he had completed twelve programs that were voluntary and did not result in sentence reductions, and he began participating in AA and NA. *Id.* at 648-49. In addition, the father

testified that he was sober, prepared to be a good father, would like to receive additional services from DCS upon his release, and stated even if his child is adopted, he hoped to remain in his life as much as possible. *Id*. at 649. Our supreme court held that despite the father's criminal and substance abuse history, "[g]iven the substantial efforts that [the father] is making to improve his life by learning to become a better parent, . . . it was not proven by clear and convincing evidence that [the father] could not remedy the conditions for [his child's] removal." *Id.*

[25] Father's situation is distinguishable from the father's in *K.E.* Although we acknowledge Father is unable to participate in DCS-offered services while incarcerated, his recent completion of these programs alone, while commendable, does not rise to the level of progress in *K.E.* nor does it negate years of his non-compliance. Critically, there is no evidence that Father's release is pending. To the contrary, all of his criminal cases remain unresolved and he faces potentially up to thirty years of incarceration, if convicted. Moreover, Father has not demonstrated the ability to remain sober when he is not incarcerated.

[26] We have often noted that evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *Lang*, 861 N.E.2d at 372; *see also A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1252 (Ind. Ct. App. 2002) ("A parent's failure to appear for assessments and court hearings reflects ambivalence, and the failure

to attend parenting classes reflects an unwillingness to change existing conditions."), *trans. denied*. Such is the case here. In sum, we conclude there is sufficient evidence in the record establishing Father's failure to participate in the case plan, preventing him from making any progress toward reunification. For these reasons, we conclude the juvenile court's findings supported its conclusion.[4]

# Conclusion

We conclude there is sufficient evidence to support the juvenile court's order terminating Father's parental rights as to Child. Accordingly, the judgment of the juvenile court is affirmed.

Affirmed.

Bradford, C.J., and Altice, J., concur.

---

[4] Having determined that DCS met its burden of showing that the conditions that resulted in Child's removal and continued placement outside of Father's care will not be remedied, we need not address the juvenile court's conclusion that DCS also met its burden of proving that the continuation of the parent child relationship poses a threat to Child's well-being. *K.T.K.*, 989 N.E.2d at 1234.